FARIDA v ZAHAR

1. TRIAL—OPENING STATEMENT—NEW CAUSE OF ACTION—OBJECTION—EVIDENCE—PRETRIAL CONFERENCE—COMPLAINT.

Reversible error resulted when a trial court allowed a plaintiff to introduce over objection a new cause of action in his opening statement and to elicit testimony regarding it throughout trial where the summary of the results of the pretrial conference reveals that both parties were in agreement as to the issues framed in the plaintiff's complaint.

2. FRAUD—ACTIONABLE FRAUD—ELEMENTS—BURDEN OF PROOF.

The elements of actionable fraud are that defendant made a material representation; that it was false; that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; that he made it with the intention that it should be acted upon by plaintiff; that plaintiff acted in reliance upon it; and that he thereby suffered injury; each of these facts must be found to exist and the absence of any one of them is fatal to a recovery.

3. PLEADING—AMENDMENTS—EVIDENCE—COURT RULE—PRETRIAL CONFERENCE.

Court rule that permits amendments of pleadings to conform them to the evidence does not permit a party to submit his case at trial on an entirely different theory than agreed to at the pretrial conference (GCR 1963, 118.3).

4. TRIAL—PRETRIAL CONFERENCE—PRETRIAL SUMMARY—MODIFICATION OF PROCEEDINGS—MANIFEST INJUSTICE.

The pretrial summary controls the subsequent course of the proceedings unless modified at or before trial to prevent manifest injustice and where the parties at the pretrial conference have narrowed the issues over which they are in dispute to

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 53 Am Jur, Trial §§ 505, 506.
[2] 37 Am Jur 2d, Fraud and Deceit § 12.
[3] 61 Am Jur 2d, Pleading §§ 279, 280.
[5] 53 Am Jur, Trial §§ 527, 528.

specific allegations of fraud, it was error for the court to allow the plaintiff to also proceed on a contract theory.

5. FRAUD—INSTRUCTIONS TO JURY—STOCK TRANSACTION.

   A defendant's requested jury instruction, in a trial where the plaintiff alleges that defendant defrauded him in a stock transaction, which said in essence that, if the jury should determine that defendant made representations to plaintiff and that such representations were merely honest expressions of opinion made in good faith, they would not be fraudulent even if they later proved erroneous, should have been given where it was the claim of defendant that he was communicating to plaintiff information that had been given to him by others and that the failure of the stock shares to reach their expected value was due to intervening events over which he had no control.

Appeal from Wayne, Benjamin D. Burdick, J. Submitted Division 1 October 30, 1973, at Detroit. (Docket No. 15219.) Decided October 30, 1973.

Complaint by Thomas K. Farida against Joseph Zahar for money damages for fraud in the sale of stock. Judgment for plaintiff. Defendant appeals. Reversed and remanded for a new trial.

*Michael Kranson,* for plaintiff.

*Thomas W. Jakuc,* for defendant.

Before: DANHOF, P. J., and FITZGERALD and WALSH,* JJ.

PER CURIAM. On February 22, 1971, plaintiff filed in the Wayne County Circuit Court a complaint against defendant in two counts. Count 1 alleged the following: In violation of MCLA 451.810; MSA 19.776(410) and while defendant was not a registered broker-dealer or agent in securities, defendant on August 27, 1969 delivered to plaintiff 6,250 shares of stock in Quixonic, Inc., for

---

* Circuit judge, sitting on the Court of Appeals by assignment.

which plaintiff paid defendant $50,000 cash, and that on September 30, 1969 defendant similarly delivered to plaintiff 10,000 shares of Dynatron, Inc., for which plaintiff paid $50,000. Count 2 of the complaint alleged fraud on the part of defendant in the following particulars: Defendant approached plaintiff in August or September of 1968 telling plaintiff that defendant owned stock in the above-named corporations; that defendant would sell this stock to plaintiff; that defendant represented to plaintiff that defendant had superior knowledge regarding the two corporations and that they would soon "go public"; that the Quixonic stock would then have a market value of $18 or $20 per share by March or April of 1969; that the Dynatron stock would have a market value of $100 per share shortly after purchase; that defendant made these representations knowing them to be false and fraudulent. Plaintiff alleged further in Count 2 that defendant failed to deliver the shares of Quixonic until August 27, 1969, and the shares of Dynatron until September 30, 1969; that defendant delivered said shares knowing them to be worthless; that defendant promised to repay $100,-000 to plaintiff at the rate of $5,000 per month, but that, after one such payment on November 5, 1969, there were no more payments. Plaintiff alleged damages in Count 2 of $95,000.

Plaintiff's Count 1 was dismissed upon defendant's motion for accelerated judgment based on the two-year statute of limitations in MCLA 451.810; MSA 19.776(410), the court having found that the contract of sale was made not later than December, 1968. A pretrial statement was filed by defendant in February, 1972 and adopted by plaintiff at the pretrial conference on March 24, 1972.

The parties went to trial before a jury on Count

2 of plaintiff's complaint. Defendant's motions for a directed verdict at the close of plaintiff's opening statement and at the close of plaintiff's proofs were denied. On July 5, 1972, the jury returned a verdict in the amount of $60,000 in favor of plaintiff. Defendant's motions for a new trial and judgment notwithstanding the verdict were denied. Defendant appeals.

Defendant claims that the trial court erred in allowing plaintiff to introduce over objection a new cause of action in his opening statement and to elicit testimony regarding the same throughout trial. We agree.

The summary of the results of the pretrial conference reveals that both parties were in agreement as to the issues framed in Count 2 of plaintiff's complaint. Therein, the parties narrowed the scope of defendant's alleged misrepresentations to the following:

"Count II is a claim for money damages in the amount of $95,000.00 plus interest, court costs and attorney fees. It is based, as is Count I, on the sale of certain shares of stock which occurred in November and December of 1968 for the sum of approximately $100,000.00 Plaintiff further alleges that these misrepresentations consist of the following: 1. Stock in question would go "public soon"; (a) That the Quixonic stock would have a value of $18.00 or $20.00 by March or April of 1969; (b) That the Dynatron stock would have a value of $100.00 shortly after purchase of the same; 2. That Defendant knew these statements were false and fraudulent and that Plaintiff would rely on the same."

Plaintiff's opening statement was however devoted almost entirely to defendant's late delivery of the promised certificates and to plaintiff's resulting inability to sell at a profit. We quote from the record:

"And what Joseph Zahar did promise my client is that he would give him some stock certificates as soon as he was able to transfer the stock certificates that he had from his possession into my client's name. He said it would take six to eight weeks. This my client believed in. For this my client gave Joseph Zahar $100,000, believing that he would get the stock certificates within the period of time that it would take to effect a transfer through the bank register.

"The allotted time came, the allotted time went. My client tried to get a hold of Joseph Zahar. Joseph Zahar "ain't" talking, "ain't" available, "ain't" around, "ain't" nowhere. He has the $100,000, and try and find him.

"My client will testify that he even got ahold of Tony Simon and said, 'Tony, get ahold of Joe. Where are my stock certificates?' And Tony will tell you about his conversation with Joseph Zahar.

"In the meantime this Dynatron stock went up. Had my client had these stock certificates, he could have sold at a profit. Had he paid $5 a share (I think it went up to nine)—so actually had he had these stock certificates, he could have made $40,000 just on this stock alone.

"Time went, time went, time went, and not way until August or September—August the 7th is the date on this one, the following year and September 30 of the following year on this one (indicating documents) and then subsequent to that time was the stock delivered to my client. By that time the stock was worthless. In fact, this $15,000 in Quixonic, spelled "Q-u-i-x-o-n-i-c" never went through any bank.

\*    \*    \*

"*Mr. Kranson (continuing):* My client has given the defendant $100,000, and what we are saying is that had we had these stock certificates in our possession when we should have had delivery, we would not be here in court today."

Absent any allegation that defendant promised delivery of the certificates at a certain time while knowing that delivery would not be made, plaintiff was proceeding on a contract theory rather than

fraud. Moreover, plaintiff's statement to the effect that, if the certificates had been delivered as promised plaintiff would have made $40,000, is inconsistent with his claim of fraudulent misrepresentation of value.

The elements of actionable fraud were set forth in *Papin v Demski,* 17 Mich App 151, 154; 169 NW2d 351, 353 (1969):

"Initially, the burden of proof in this case, as always, was on the plaintiffs. It was essential to their cause of action based on fraud that certain facts be established. Our Supreme Court in *A & A Asphalt Paving Company v Pontiac Speedway, Inc* (1961), 363 Mich 634, 639 [110 NW2d 601, 604], quoted with approval the following statement relative to the essential facts:

" 'The general rule is that to constitute actionable fraud it must appear: (1) that defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.' " *(Aff'd* 383 Mich 561, 177 NW2d 166 [1970].)

An examination of the record reveals that plaintiff's numerous references to defendant's failure to timely deliver were not confined to the opening statement, but became the object of testimony during the course of trial, and were again alluded to in plaintiff's closing argument. Defendant objected to plaintiff's opening statement and to the introduction of a new cause of action resulting in surprise. Although GCR 1963, 118.3 permits amendments to conform to proofs, nevertheless it

does not permit a party to submit his case on an entirely different theory. *Adair v Thoms,* 5 Mich App 195; 146 NW2d 81 (1966); *Denno v Providence Hospital,* 19 Mich App 547; 172 NW2d 918 (1969). The pretrial summary controls the subsequent course of the proceedings, unless modified at or before trial to prevent manifest injustice. GCR 1963, 301.3. Where the parties at the pretrial conference have narrowed the issues over which they are in dispute to specific allegations of fraud, it was error for the court to allow plaintiff to also proceed on a contract theory.

Defendant further contends that the trial court erred in refusing a requested instruction which said in essence that, if the jury should determine that defendant made representations to plaintiff and that such representations were merely honest expressions of opinion made in good faith, they would not be fraudulent even if they later proved erroneous. Upon retrial, an instruction to that effect would be in order. While plaintiff claimed that defendant had deliberately misrepresented the future value of the Dynatron and Quixonic shares, it was the claim of defendant that he was communicating to plaintiff information that had been given to him by others. Defendant further claimed that the failure of the shares to reach their expected value was due to intervening events over which he had no control, *i.e.,* a cease and desist order preventing trading of the Dynatron shares and the breach by a Japanese corporation of a distributorship agreement with Quixonic.

In view of our disposition of this matter, the other issues raised by defendant need not be discussed.

Reversed and remanded for new trial. Costs to defendant.